## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

CATHERINE A. FISHER TRUSTEE U/A DTD
MAY 29, 1993 CATHERINE A. FISHER TRUST
On Behalf of Itself and All Others Similarly Situated,

Plaintiff,

vs.

LINN ENERGY LLC, MARK E. ELLIS, KOLJA
ROCKOV, and DAVID B. ROTTINO,

Defendants.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## SECURITIES CLASS ACTION COMPLAINT

Plaintiff Catherine A. Fisher Trust U/A DTD May 29, 1993 Catherine A. Fisher Trust ("Plaintiff"), by its attorneys and on behalf of itself and the class Plaintiff seeks to represent, makes the following allegations against defendants Linn Energy LLC ("LINE" or the "Company"), Mark E. Ellis, Kolja Rockov, and David B. Rottino (collectively, "Defendants"):

1.      This is a federal securities class action under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of persons or entities that purchased LINE master limited partnership units between February 24, 2011, and July 1, 2013, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to seek remedies pursuant to §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendants.

2.      This case arises from material misleading statements and omissions made by the Company in its press releases, Securities and Exchange Commission ("SEC") filings and other

public statements, which were endorsed and approved by the Company's Chief Executive Officer ("CEO") Mark E. Ellis, Chief Financial Officer ("CFO") Kolja Rockov and Chief Accounting Officer ("CAO") David B. Rottino during the Class Period.  As detailed below, LINE enticed investors into purchasing the Company's units through its use of non-Generally Accepted Accounting Principles ("GAAP") accounting measures and concealment of material information concerning the effect of the Company's actual capital expenditures and derivative investment costs on its distributable cash flow, a master limited partnership equivalent of a dividend.

3.      LINE's financial reporting is dually complex because while it reports net income based on GAAP principles, it also uses non-GAAP measures in reporting adjusted EBITDA and distributable cash flow available to unitholders.  Based on its GAAP financials, the Company had lost money in three of its past four years, including ($1.92) per unit in 2012, but its use of non-GAAP measures enabled it to entice investors with its unduly high and unsustainable distributable cash flow.

4.      Toward the end of the Class Period, the truth began to emerge when *Barron's* published a series of articles that explained how LINE's accounting practices and exclusion of certain expenses was leading to an artificially inflated unit price.  Barron's explained that the Company's reporting of its distributable cash flow, its primary draw for investors, was non-GAAP compliant, excluding certain expenses that was rendering the continuation of LINE's high-yield distribution unsustainable.  Barron's highlighted that LINE was failing to account properly for the costs of certain derivative contracts – specifically, put options -- and certain capital expenditures in its distributable cash flow calculations.

5.     As a result of these revelations, the Company's unit price stumbled 5%, down to a close of $33.75 per unit on May 6, 2013.

6.     On June 4, 2013, the Company filed a Form S-4/A with the SEC in connection with its proposed acquisition of Berry Petroleum Company ("Berry"). Buried within this filing, the Company disclosed for the first time some of the actual costs associated with its derivative hedging strategy. This previously undisclosed information confirmed Barron's reports – the Company was overstating its distributable cash flow figures and had been misleading investors.

7.     Finally, on July 1, 2013, LINE disclosed in an amended filing with the SEC that the SEC had opened an informal investigation into the Company's non-GAAP accounting practices, its hedging strategy and the proposed acquisition of Berry jointly with its affiliate, LinnCo LLC. Following this revelation, the Company's per unit market price fell $10.50 per unit, or 31.5%, down to a close of $22.79 per unit on July 3, 2013.

8.     During the Class Period, Defendants deceived LINE unit investors by purposely presenting materially misleading and incomplete information regarding the Company's distributable cash flow, and thus, its true value and financial condition. At all relevant times, Defendants knew LINE's true value and financial condition, and purposely induced the investing public, in part, through the enticement of lucrative distributions, to invest in the Company and to believe that the units' market price accurately reflected LINE's value.

9.     Defendants knew the Company's true value because they had complete access to the information used to calculate the Company's GAAP figures and excluded from the non-GAAP calculation of distributable cash flow. Further, Defendants were aware that the full and complete disclosure of the non-GAAP excluded items would reveal that the Company's highly attractive distribution yield was unsustainable. Without the assurance of a lucrative distribution

3

yield, LINE's units would lose their artificially inflated value and unitholders would suffer the resultant harm.

10.     Defendants withheld from the market material information about the actual value of the Company and information concerning the Company's distributable cash flow. Defendants' actions violated their disclosure duties to LINE unit investors, and violated Sections 10b and 20(a) of the Exchange Act, and SEC Rule 10b-5.   As a result of Defendants' misconduct, Plaintiff and the Class have suffered substantial harm.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 27 of the 1934 Act.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  LINE maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

14.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including the mail, the internet, telephone communications and the facilities of national securities exchanges.

## PARTIES

**A.     Plaintiff**

15.     Plaintiff Catherine A. Fisher Trustee U/A DTD May 29, 1993 Catherine A. Fisher Trust is a LINE unit investor that purchased the Company's stock during the Class Period, as set forth below, and as set forth in its certification filed in this action, a copy of which is attached

hereto as Exhibit A.

**B.      Defendants**

16.      Defendant LINE is a Delaware Corporation that maintains its principal place of business at 600 Travis, Suite 5100, Houston, Texas.  LINE is an independent oil and natural gas company focused on the development, exploitation and acquisition of natural gas.  The Company's properties are located in six operating regions in the United States' Mid-Continent Deep, Mid-Continent Shallow, Permian Basin, Michigan, California and Williston Basin.  The Mid-Continent Deep operations include the Texas Panhandle Deep Granite Wash formation and deep formations in Oklahoma and Kansas.  The Mid-Continent Shallow operations include the Texas Panhandle Brown Dolomite formation and shallow formations in Oklahoma, Louisiana and Illinois.  The Permian Basin operations include areas in West Texas and Southeast New Mexico.  The Michigan operations include the Antrim Shale formation in the northern part of the state.  The California operations include the Brea Olinda Field of the Los Angeles Basin and The Williston Basin operations include the Bakken formation in North Dakota. The Company was founded by Michael C. Linn on March 14, 2003.

17.      Defendant Mark E. Ellis ("Ellis") is currently, and was throughout the Class Period, President and CEO of LINE and was appointed Chairman of the Board of Directors in December 2011.

18.      Defendant Kolja Rockov ("Rockov") is currently, and was throughout the Class Period, CFO and Executive Vice President of LINE.

19.      Defendant David B. Rottino ("Rottino") is currently, and was throughout the Class Period, CAO and Executive Vice President of LINE.

20.      The defendants referenced in ¶¶ 17-19 are referred to herein as the "Individual Defendants."

5

21.     The Individual Defendants were at all relevant times during the Class Period controlling persons of LINE within the meaning of Section 20(a) of the Exchange Act.  Because of the Individual Defendants' positions with the Company, they had access to undisclosed information about its cash flow, its assets, and its present and future business prospects through, among other means, access to internal corporate and partnership documents.

22.     The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in its day-to-day operations.  The Individual Defendants made affirmative misrepresentations, as described herein, and were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein (including SEC filings, press releases and other publications), were aware of or recklessly disregarded that materially false or misleading statements were being issued regarding the Company, and nonetheless approved or ratified these statements in violation of the federal securities laws.

23.     As officers and controlling persons of a publicly held company whose units were, and are, registered with the SEC, traded on the NASDAQ Stock Market ("NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, cash flow, assets, future prospects and liquidity, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful, complete and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons or entities who purchased LINE master limited partnership units during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

25.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, LINE units were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.  Unit investors and other members of the Class may be identified from records maintained by LINE or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

26.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

27.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

28.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and cash flow of LINE;

(c)     whether the Individual Defendants caused LINE to issue false and misleading financial statements;

(d)     whether Defendants acted knowingly or recklessly in issuing false or misleading financial statements; and

(e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

29.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### LINE's False and Misleading Statements

30.     On February 24, 2011, LINE issued a press release announcing its earnings for the fourth fiscal quarter and fiscal year of 2010, ended December 31, 2010.  The Company reported its non-GAAP results, with adjusted net income of $0.43 per unit for the fourth quarter of 2010 and $1.54 per unit for the fiscal year 2010.  In addition, LINE's adjusted earnings before interest, taxes, depreciation and amortization ("EBITDA") rose 55% to $211 million for the

fourth quarter of 2010 compared to the same quarter in 2009 and increased to $732 million compared to $566 million in fiscal 2009.  With respect to its distributions, the Company reported a distribution coverage ratio of 1.23x for fiscal year 2010 compared to 1.14x for fiscal year 2009. On February 28, 2011, the Company filed its Form 10-K with the SEC.  The Company's Form 10-K revealed that the Company had suffered an approximately $114 million net loss or ($0.80 per unit) for the 210 fiscal year.  The Form 10-K also stated the following, in pertinent part as to its cash flow management and hedging strategies:

> Efficiently Operate and Develop Acquired Properties
>
> The Company has centralized the operation of its acquired properties into defined operating regions to minimize operating costs and maximize production and capital efficiency.  The Company maintains a large inventory of drilling and optimization projects within each region to achieve organic growth from its capital development program.  The Company seeks to be the operator of its properties so that it can develop drilling programs and optimization projects that not only replace production, but add value through reserve and production growth and future operational synergies.  The development program is focused on lower-risk, repeatable drilling opportunities to maintain and/or grow cash flow.  Many of the wells are completed in multiple producing zones with commingled production and long economic lives.  In addition, the Company seeks to deliver attractive financial returns by leveraging its experienced workforce and scalable infrastructure.  For 2011, the Company estimates its total capital expenditures, excluding acquisitions, will be approximately $520 million, including $480 million related to its oil and natural gas capital program and $23 million related to its plant and pipeline capital.  This estimate is under continuous review and is subject to ongoing adjustment.  The Company expects to fund these capital expenditures primarily with cash flow from operations and cash on hand.
>
> Reduce Cash Flow Volatility Through Hedging
>
> An important part of the Company's business strategy includes hedging a significant portion of its forecasted production to reduce exposure to fluctuations in the prices of oil and natural gas and provide long-term cash flow predictability to pay distributions, service debt and manage its business.  By removing a significant

portion of the price volatility associated with future production, the Company expects to mitigate, but not eliminate, the potential effects of variability in cash flow from operations due to fluctuations in commodity prices.

These commodity hedging transactions are primarily in the form of swap contracts, put options and collars that are designed to provide a fixed price (swap contracts), fixed price floor with opportunity for upside (put options) or range of prices between a price floor and a price ceiling (collars) that the Company will receive as compared to floating market prices.  The Company has derivative contracts in place for 2011 through 2015 at average prices ranging from a low of $84.09 per Bbl to a high of $93.58 per Bbl for oil and from a low of $5.65 per MMBtu to a high of $8.24 per MMBtu for natural gas.  See Note 7 for the specific years and the related commodity prices.  Additionally, the Company has derivative contracts in place covering a substantial portion of its exposure to the Mid-Continent natural gas basis differential through 2015.

In addition, the Company may from time to time enter into derivative contracts in the form of interest rate swaps to minimize the effects of fluctuations in interest rates.  Currently, the Company has no outstanding interest rate swaps.  For additional details about the Company's commodity derivative contracts, see Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Item 7A. "Quantitative and Qualitative Disclosures About Market Risk."  See also Note 7 and Note 8.

31.    On April 28, 2011, LINE issued a press release announcing its earnings for the first fiscal quarter of 2011, ended March 31, 2011.  The Company reported a quarterly net loss of $447 million or ($2.75) per unit, as compared to net income of $65 million, or $0.50 per unit for the first fiscal quarter of 2010.  Additionally, LINE reported quarterly increases in its non-GAAP results, with adjusted net income of $62 million compared to $47 million or $0.38 per unit compared to $0.36 per unit in the first fiscal quarter of 2010, and adjusted EBITDA of $210 million increased approximately $58 million from the same quarter of the prior year.  With respect to its distributions, the Company reported a quarterly distribution coverage ratio of 1.15x compared to 1.34x for the fourth quarter of 2010.  Also on April 28, 2011, the Company filed its

Form 10-Q for the first fiscal quarter of 2011 with the SEC and reiterated LINE's previously announced quarterly financial results.

32.     On July 28, 2011, LINE issued a press release announcing its earnings for the second fiscal quarter of 2011, ended June 30, 2011.  The Company reported quarterly net income of $237 million, or $1.34 per unit, as compared to net income of $60 million, or $0.41 per unit for the second fiscal quarter of 2010.  Additionally, LINE reported quarterly increases in its non-GAAP results, with adjusted net income of $83 million or $0.47 per unit compared to $53 million or $0.36 per unit in the same quarter of 2010.  Adjusted EBITDA increased to $264 million from $175 million for the same quarter of the prior year.  With respect to its distributions, the Company reported a quarterly distribution coverage ratio of 1.42x compared to 1.15x for the first quarter of 2011.  Also on July 28, 2011, the Company filed its Form 10-Q for the second fiscal quarter of 2011 with the SEC and reiterated LINE's previously announced quarterly financial results.

33.     On October 27, 2011, the Company issued a press release announcing its earnings for the third fiscal quarter of 2011, ended September 30, 2011.  The Company reported quarterly adjusted EBITDA of $243 million and adjusted net income of $0.44 per unit.  Further, the Company reported a quarterly distribution coverage ratio of 1.14x compared to 1.42x for the second quarter of 2011.  The press release also stated, in pertinent part:

> LINN utilizes commodity hedging to capture cash-flow margin and reduce cash-flow volatility. The Company reported gains on derivatives from oil and natural gas hedges of approximately $824 million for the quarter. This includes approximately $732 million of noncash gains from the change in fair value of derivatives, due to a decrease in commodity prices, and realized hedge gains of approximately $92 million during the third quarter. The realized hedge gains include approximately $27 million of gains related to canceled derivatives. Noncash gains or losses do not affect

adjusted EBITDA, cash flow from operations or the Company's ability to pay cash distributions.

For the third quarter 2011, the Company reported net income of approximately $838 million, or $4.74 per unit, which includes a noncash gain of $732 million, or $4.15 per unit, from the change in fair value of derivatives covering future production, and a realized gain of $27 million, or $0.15 per unit, on the cancellation of derivatives. Excluding these items, adjusted net income (a non-GAAP financial measure) for the third quarter 2011 was approximately $79 million, or $0.44 per unit.

34.     Also on October 27, 2011, the Company filed its Form 10-Q for the third fiscal quarter of 2011 with the SEC and reiterated LINE's previously announced quarterly financial results.

35.     On February 23, 2012, the Company issued a press release announcing its earnings for the fourth fiscal quarter and fiscal year of 2011, ended December 31, 2011.  The Company reported quarterly a net loss of $190 million or ($1.09) per unit.  Additionally, LINE reported quarterly increases in its non-GAAP financial results, with adjusted net income of $89 million or $0.51 per unit compared to $63 million or $0.43 per unit, and adjusted EBITDA of $281 million increasing from $221 million for the same quarter in the prior year.  The Company reported yearly net income of $438 million or $2.52 per unit increasing from $114 million or ($0.80) for the prior year.    LINE reported yearly increases in its non-GAAP results, with adjusted net income of $313 million or $1.80 per unit compared to $219 million or $1.54 per unit for the prior fiscal year.  Adjusted EBITDA also rose to $998 million from $732 million for the prior fiscal year.  With respect to its distributions, the Company reported a yearly distribution coverage ratio of 1.24x for fiscal year 2011 compared to 1.23x for the fiscal year 2010.

36.     Also on February 23, 2012, the Company filed its Form 10-K for the fourth fiscal quarter and fiscal year of 2011 with the SEC and reiterated its previously announced quarterly

and yearly financial results.  The Form 10-K represented the following about the Company's business strategy, in pertinent part:

> Efficiently Operate and Develop Acquired Properties
>
> The Company has centralized the operation of its acquired properties into defined operating regions to minimize operating costs and maximize production and capital efficiency. The Company maintains a large inventory of drilling and optimization projects within each region to achieve organic growth from its capital development program. The Company generally seeks to be the operator of its properties so that it can develop drilling programs and optimization projects that not only replace production, but add value through reserve and production growth and future operational synergies. The development program is focused on lower-risk, repeatable drilling opportunities to maintain and/or grow cash flow. Many of the wells are completed in multiple producing zones with commingled production and long economic lives. In addition, the Company seeks to deliver attractive financial returns by leveraging its experienced workforce and scalable infrastructure. For 2012, the Company estimates its total capital expenditures, excluding acquisitions, will be approximately $940 million, including $880 million related to its oil and natural gas capital program and $40 million related to its plant and pipeline capital. This estimate is under continuous review and is subject to ongoing adjustments. The Company expects to fund these capital expenditures primarily with cash flow from operations and bank borrowings.
>
> Reduce Cash Flow Volatility Through Hedging
>
> An important part of the Company's business strategy includes hedging a significant portion of its forecasted production to reduce exposure to fluctuations in the prices of oil and natural gas and provide long-term cash flow predictability to pay distributions, service debt and manage its business. By removing a significant portion of the price volatility associated with future production, the Company expects to mitigate, but not eliminate, the potential effects of variability in cash flow from operations due to fluctuations in commodity prices.
>
> These commodity hedging transactions are primarily in the form of swap contracts and put options that are designed to provide a fixed price (swap contracts) or fixed price floor with the opportunity for upside (put options) that the Company will receive as compared to floating market prices. The Company has derivative contracts in

place for 2011 through 2016 at average prices ranging from a low of $95.39 per Bbl to a high of $98.44 per Bbl for oil and from a low of $5.00 per MMBtu to a high of $5.84 per MMBtu for natural gas. See Note 7 for the specific years and the related commodity prices. Additionally, the Company has derivative contracts in place covering a substantial portion of its exposure to the Mid-Continent natural gas basis differential through 2015 and its timing risk exposure on Mid-Continent and Permian Basin oil sales through 2014.

37.     On April 26, 2012, the Company issued a press release announcing its earnings for the first fiscal quarter of 2012, ended March 31, 2012.  LINE reported a quarterly net loss of $6 million or ($0.04) per unit as compared to a net loss of $447 million, or ($2.75) per unit for the first fiscal quarter of 2011.  Additionally, LINE reported its quarterly non-GAAP results, with adjusted net income of $48 million and $0.25 per unit falling from $62 million and $0.38 per unit from the same quarter in the prior year.  Adjusted EBITDA, however, increased to $302 million from $210 million in the same quarter of the prior year.  With respect to its distributions, the Company reported a quarterly distribution coverage ratio of 1.14x compared to 1.36 for the fourth quarter of 2011.  On April 26, 2012, the Company filed its Form 10-Q for the first fiscal quarter of 2012 with the SEC and reiterated the Company's previously announced quarterly financial results.

38.     On July 26, 2012, the Company issued a press release announcing its earnings for the second fiscal quarter of 2012, ended June 30, 2012.  LINE reported quarterly net income of $237 million or $1.19 per unit as compared to a net loss of $237 million, or ($1.34) per unit for the second fiscal quarter of 2011.  Additionally, LINE reported its quarterly non-GAAP results, with adjusted net income of $61 million and $0.31 per unit falling from $83 million and $0.47 per unit from the same quarter in the prior year.  Adjusted EBITDA, however, increased to $319 million from $264 million in the same quarter of the prior year.  With respect to its distributions, the Company reported a quarterly distribution coverage ratio of .97x compared to 1.14x for the

14

first quarter of 2012.  On July 26, 2012, the Company filed its Form 10-Q for the second fiscal quarter of 2012 with the SEC and reiterated the Company's previously announced quarterly financial results.

39.     On October 11, 2012, LINE announced the pricing of the initial public offering of 30,250,000 common shares of LinnCo, LLC ("LinnCo"), a wholly-owned subsidiary of LINE, at $36.50 per common share, which was to begin trading on the NASDAQ on October 12, 2012 under the ticker symbol "LNCO."   According to an article published in the New York Times on February 21, 2013, LINE created LinnCo to function as a shell company for the purpose of creating "a currency for billions of dollars of deals a year. The idea is to keep adding returns from older wells to the income stream."  As stated in a recent LINE press release, "LNCO was created to enhance LINN Energy's ability to raise additional equity capital to execute on its acquisition and growth strategy."  LNCO is also a publicly traded company.

40.     On October 25, 2012, the Company issued a press release announcing its earnings for the third fiscal quarter of 2012 ended September 30, 2012.  LINE reported a quarterly net loss of $430 million, or ($2.18) per unit, as compared to net income of $838 million, or $4.74 per unit for the third fiscal quarter of 2011.  Additionally, LINE reported quarterly increase for its non-GAAP results, with adjusted net income increasing to $90 million or $0.45 per unit from $79 million or $0.44 per unit.  Adjusted EBITDA also increased to $402 million from $243 million for the same quarter of the prior year.  With respect to its distributions, the Company reported a quarterly distribution coverage ratio of 1.40x compared to .97x for the second quarter of 2012.  Also on October 25, 2012, the Company filed its Form 10-Q for the third fiscal quarter of 2012 with the SEC and reiterated the Company's previously announced quarterly financial results.

41.     In furtherance of its strategic acquisition plan, on February 21, 2013, LINE, LinnCo, and Berry announced the signing of a definitive merger agreement pursuant to which LINN and LinnCo intend to acquire all of Berry's outstanding shares for total consideration of $4.3 billion, including the assumption of debt.  The transaction, which is structured as a stock-for-stock merger of Berry with LinnCo followed by the acquisition of the Berry assets by LINE, is expected to be tax-free to Berry shareholders.  Under the terms of the deal, LinnCo will issue 1.25 new common shares for each Berry share, which amounts to $46.24 a share, a premium of roughly 20 percent to Berry's closing price prior to the deal being disclosed.  LinnCo will then transfer Berry's assets to LINE in exchange for additional ownership units in LINE.

42.     Also on February 21, 2013, the Company issued a press release announcing its earnings for the fourth fiscal quarter and full year of 2012, ended December 31, 2012.  LINE reported a quarterly net loss of $187 million, or ($0.83) per unit, as compared to a net loss of $190 million or ($1.09) per unit for fourth fiscal quarter of 2011.  Additionally, LINE reported on its quarterly non-GAAP results, with adjusted net income of $94 million and adjusted EBITDA of $379 million increasing from $89 million in adjusted net income and $281 million in adjusted EBITDA from the same quarter in the prior year.  However, adjusted earnings per unit were down to $0.41 per unit compared to $0.51 per unit in the prior year.  LINE reported a net yearly net loss of $387 million, or ($1.92) per unit, as compared to net income of $438 million, or $2.52 per unit for the year in 2011.  The Company reported on its yearly non-GAAP results, with adjusted net income of $293 million or $1.44 per unit down from the adjusted net income of $313 million or $1.80 per unit in fiscal year 2011.  Adjusted EBITDA rose year-over-year, however, to $1.04 billion from $998 million in 2011.  With respect to its distributions, the

Company reported a yearly distribution coverage ratio of 1.14x for fiscal year 2012 compared to 1.24x for fiscal year 2011.

43.  Later that day, LINE filed its Form 10-K for the fourth fiscal quarter and full year of 2012 with the SEC and reiterated the previously announced financial results.  The Form 10-K stated the following, in pertinent part:

Efficiently Operate and Develop Acquired Properties

The Company has centralized the operation of its acquired properties into defined operating regions to minimize operating costs and maximize production and capital efficiency. The Company maintains a large inventory of drilling and optimization projects within each region to achieve organic growth from its capital development program. The Company generally seeks to be the operator of its properties so that it can develop drilling programs and optimization projects that not only replace production, but add value through reserve and production growth and future operational synergies. The development program is focused on lower-risk, repeatable drilling opportunities to maintain and/or grow cash flow. Many of the wells are completed in multiple producing zones with commingled production and long economic lives. In addition, the Company seeks to deliver attractive financial returns by leveraging its experienced workforce and scalable infrastructure. For 2013, the Company estimates its total capital expenditures, excluding acquisitions, will be approximately $1.2 billion, including $1.1 billion related to its oil and natural gas capital program and $67 million related to its plant and pipeline capital. This estimate is under continuous review and is subject to ongoing adjustments. The Company expects to fund these capital expenditures primarily with cash flow from operations and bank borrowings.

Reduce Cash Flow Volatility Through Hedging

An important part of the Company's business strategy includes hedging a significant portion of its forecasted production to reduce exposure to fluctuations in the prices of oil and natural gas and provide long-term cash flow predictability to pay distributions, service debt and manage its business. By removing a significant portion of the price volatility associated with future production, the Company expects to mitigate, but not eliminate, the potential effects of variability in cash flow from operations due to fluctuations in commodity prices.

> The Company enters into commodity hedging transactions primarily in the form of swap contracts and put options that are designed to provide a fixed price (swap contracts) or fixed price floor with the opportunity for upside (put options) that the Company will receive as compared to floating market prices.

44.     On April 25, 2013, the Company issued a press release announcing its earnings for the first fiscal quarter of 2013, ended March 31, 2013.  LINE reported a quarterly net loss of $222 million or ($0.96) per unit, as compared to a net loss of $6 million or ($0.04) per unit for the first fiscal quarter of 2012.  Additionally, LINE reported its quarterly results, using non-GAAP measures, with adjusted net income of $37 million, or $0.16 per unit, down from adjusted net income of $48 million, or $0.25 per unit, for the same quarter in 2012.  Adjusted EBITDA, however, did increase to $356 million from $302 million during the same quarter in 2012.  With respect to its distributions, the Company reported a quarterly distribution coverage ratio of .88x compared to 1.07x for the fourth quarter of 2012.  Also on April 25, 2013, the Company filed its Form 10-Q for the first fiscal quarter of 2013 with the SEC and reiterated the previously announced financial results.

45.     The statements referenced in ¶¶ 30-38, 40, and 42-44 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse information, which were known or recklessly disregarded by Defendants, including that:

A. LINE was engaged in improper accounting practices for its hedging strategy, including the failure to properly treat certain derivative transaction costs as expenses in its non-GAAP accounting; and

B. LINE was overstating the distributable cash flow available to unitholders by improperly excluding certain expenditures from its accounting, including costs from derivative transactions (including put options purchases) and the incursion of heavy capital expenditures without offsetting production gains.

46.    As a result of the foregoing, the Company's statements – including, -- but not limited to, its adjusted net income, distributable cash flow and adjusted EBITDA results were materially false and misleading at all relevant times.

**Barron's Investigation into LINE's Questionable Accounting Practices**

47.    On February 16, 2013, Barron's published an article entitled "Drilling Into the Numbers", which explored the possibility that LINE was overvalued by the market because of its questionable non-GAAP accounting practices.   The article stated that LINE appeared to be overstating its distributable cash flows by realizing the gains from its hedging strategy while excluding the costs of put options.   According to the article, hedging was a sizeable portion of the Company's distributable cash flow, as its gains totaled $281 million, or 55%, of LINE's distributable cash flow for the first nine months of 2012.

48.    LINE uses its derivatives portfolio to insulate the Company from a weak natural-gas market and allowed it to pay a steadily rising distribution.   For example, in the 2012 fiscal third quarter, it received a price of $2.71 per thousand cubic feet ("Mcf") for its natural gas, but realized more than $5 per Mcf after accounting for hedging gains resulting from LINE's use of put options to lock in future oil and gas prices.   The Company has primarily purchased in-the-money puts options on natural gas, which are more expensive than at-the-money options. Specifically, LINE purchased puts struck at $5 per Mcf from 2013 through 2017, at a time when the average price for preceding five year period was in the $4.00 to $4.50 range.

49.    The likelihood of such gains explains why LINE substantially invested in derivatives during 2012, purchasing $583 million during 2012.   As explained by the Barron's article, however, the Company accounts for its derivative investments and puts as a depreciable asset and, thus, does not deduct the cost of its financial derivatives and puts from its realized

gains in hedging activity.  As a result, this substantial portion of distributable cash flow has been overstated.

50.     On May 4, 2013, Barron's published a second article entitled "Twilight of a Stock Market Darling" that shed further light on LINE's overstated distributable cash flow.  The article referred to the Company as "the country's most overpriced energy producer" and stated that the Company has been able to avoid scrutiny from its unitholders because of its healthy yield, which was 7.5% in the 2013 first fiscal quarter.  LINE, however, did not generate enough cash to cover its distribution in the quarter.  Despite this failure, according to the article, LINE expected to increase its distribution to $0.77 cents from $0.725 cents following the consummation of the Berry acquisition.

51.     The Barron's article further reported that the Company's disappointing distributable cash flow figures were nonetheless overly optimistic and materially overstated.  The Company's distributable cash flow did not include the cost of its financial derivatives, specifically the in-the-money put options on natural gas that constituted a majority of LINE's portfolio.  Tellingly, since Barron's first uncovered this practice in February 2013, the Company ceased purchasing put options.

52.     Additionally, the Company's energy production had flattened despite increased capital expenditures.  On April 25, 2013, the Company's first fiscal quarter financial report revealed total energy production averaging 796 Mcf per day.  This was below LINE's guidance of about 827 Mcf per day and stagnant when compared with the two previous quarters.  LINE did not forecast much improvement in the second fiscal quarter of 2013.

53.     In calculating distributable cash flow under the non-GAAP measure LINE relies upon, the Company takes its earnings before interest, taxes, depreciation and amortization

("EBITDA") and then subtracts cash interest expense and maintenance capital expenditures or the amount sufficient to maintain its energy production. For example, during the first fiscal quarter of 2013, LINE reported an adjusted EBITDA of approximately $356 million and calculated distributable cash flow of $151 million; those figures came after the deduction of $95 million of cash interest expense and $110 million of maintenance capital expenses. LINE also reported that its total capital expenditures were approximately $260 million for the quarter. The $150 million difference between total capital expenditures and maintenance capital expenses is what LINE refers to as growth capital expenditures.

54.     LINE's calculation of distributable cash flow ignored this $150 million despite the Company's flat production numbers. As explained by Hedgeye Risk Management analyst Kevin Kaiser in the May 4, 2013, Barron's article, "It doesn't make any sense. Linn can't keep production flat despite $260 million in capital expenditures. Yet the amount of capital spending that is deducted from their definition of distributable cash flow was only $110 million." With this absent $150 million taken out of the Company's distributable cash flow, LINE was left with approximately $1 million to account for its distributable cash flow.

55.     Further, as previously reported by Barron's on February 16, 2013, and reiterated on May 4, 2013, LINE's distributable cash flow reporting did not account for the Company's derivatives and puts cost. While these expenses were recognized in the Company's calculation of GAAP financials like net income, they were excluded from distributable cash flow. Under the distributable cash flow analysis, the Company recognized none of the initial costs and essentially purchased the put option for free. A proper distributable cash flow analysis, including LINE's derivative expenses, was impossible for the unitholders to perform because LINE never

disclosed the cost of its put options.  This resulted in materially misleading distributable cash flow figures that overstated the Company's financial condition.

56.     Following these revelations, LINE declined $1.97 per unit, or more than 5% to close at $35.75 per unit on May 6, 2013.

**The Truth Emerges**

57.     On June 4, 2013, LINE filed a Form S-4/A with the SEC in connection with its proposed acquisition of Berry.  Within this filing, buried on page 257 in a footnote, the Company revealed, for the first time, the costs associated with its derivative hedging strategy in an explanation for its mark-to-market (gains) losses on commodity derivatives.  This previously undisclosed information revealed what Barron's had surmised – the Company's distributable cash flow figures were misleading to investors.  The footnote stated the following:

> Represent changes in fair value of the derivative contracts from period to period and include the premiums associated with put option contracts over time. LINN considers the cost of premiums paid for put options as an investment related to its underlying oil and natural gas properties only for the purpose of calculating the non-GAAP measures of adjusted EBITDA and DCF. The premiums paid for put options that settled during the three months ended March 31, 2013 and March 31, 2012 and during the years ended December 31, 2012, 2011 and 2010 were approximately $43 million, $26 million, $148 million, $88 million and $94 million, respectively.

58.     On June 15, 2013, Barron's published a third article entitled "Linn Comes Clean on Derivative Costs."  The article characterized LINE's accounting as "aggressive" and stated that "the company wants recognize the financial benefits of the puts, but not the costs."  The article also includes a quote from New York tax expert Robert Wilens, who stated the following:

> "It's the gain or loss from the derivative transaction that must be reflected in pre-tax accounting income, not merely the proceeds derived from the sale or disposition of the derivative," says New York tax expert Robert Willens. "I can't think of an accounting

> principle or theory that would permit recording only the proceeds
> from the derivative while ignoring the cost."

59.    Following the release of this article, LINE fell another $0.55 per unit, or nearly 2%, to close at $30.52 per unit on June 17, 2013.

60.    On July 1, 2013, following the market's close, LINE disclosed that the SEC had initiated an informal investigation and requested the preservation of documents and communications pertaining to, among other things, "LinnCo's proposed merger with Berry Petroleum Company, and LINN and LinnCo's use of non-GAAP measures and hedging strategy."

61.    Following this revelation, the Company's unit price collapsed $6.24 per unit, down 19% to $27.05 per unit on July 2, 2013.  On July 3, 2013, the stock took another plunge down $4.26 per unit, or nearly 16% to close at $22.79 per unit.

62.    At this time, it is uncertain what effect the SEC investigation will have on the deal to acquire Berry.  If that acquisition cannot be completed, the Company and its unit investors will suffer further harm as LINE will unlikely be able to meet its expected - - or sustain its current cash flow - - distributions and its trading price and value will suffer further damage.

**The Company's Statements Were Materially False and Misleading**

63.    The Company's earnings reports were false and misleading because defendants overstated cash flow available for distribution by failing to deduct the cost of financial derivatives – primarily put options – from realized gains on hedging activities and the cost of certain capital expenditures.

64.    The Company's earnings omitted material information indicating that a sizeable percentage of distributable cash flow was attributable to gains on hedging activities.

65.     The Company's earnings were misleading because they characterized the cost of purchasing put options as capital investments in order not to reduce distributable cash flow, which would have placed downward pressure on the Company's yield.

66.     The Company's earnings were presented in a manner that rendered it impossible to calculate the effect the puts options had on distributable cash.  Accordingly, the Company's earnings misleadingly represented that the Company covered its quarterly distributions with cash on hand when, in actuality, once the cost associated with the options was factored in, the Company coverage ratio was at a discount to the actual distribution.  Further, the Company's earnings were opaque in that investors were unable to determine whether the distributions were made from free cash flow or through the sale of equity and debt.

67.     The Company failed to disclose that under certain accounting methodologies, the Company had negative cash flow after deducting total capital expenditures and factoring other adjustments.

68.     The Company falsely depicted its put contracts as "capital" costs and considered the premiums its paid as part of a capital investment in the underlying business.   Thus, the Company implied that it was buying the puts for free when it actuality was expending cash but not reflecting that expense and thus, lowering distributable cash flow.

**Causation and Economic Loss**

69.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and specifically developed a course of conduct to maintain an artificially high market price for LINE units.  Defendants' course of conduct operated as deceit on purchasers of LINE units during the Class Period by misrepresenting the Company's distributable cash flow and non-GAAP financials by the omission and nondisclosure of certain material items.  When Defendants' prior misrepresentations, deceptive conduct and the resultant SEC investigation into

the Company were revealed to investors, the price of the LINE units collapsed, eliminating the prior artificial inflation therein.  As a result, Plaintiff and other members of the Class suffered economic losses, i.e. damages under the federal securities laws, when they bought their units at an inflated price.

70.     By improperly characterizing the Company's distributable cash flow, Defendants presented a misleading image from which to value LINE units.  During the Class Period, Defendants failed to disclose the financial information necessary for unitholders to determine the viability of the Company's high distribution yield.  Unquestionably, the Company's high yield distribution drove the price of LINE units to artificially inflated and unsustainable levels given LINE's actual financial and operational state.  Defendants' omissions and misstatements caused the market to assign an artificially high price to LINE units throughout the Class Period until the truth was ultimately revealed to investors.

71.     Defendants' false and materially misleading representations had the intended effect of causing LINE units to trade at artificially inflated level throughout the Class Period, reaching a high of $42.52 per unit on November 1, 2012, and trading well above its current levels throughout the Class Period.

72.     On July 1, 2013, when the concerns of Barron's and the market were confirmed with the announcement of an SEC investigation into the Company's accounting practices and acquisition of Berry, the artificial inflation of the stock was removed.  In response to these revelations, the Company's units plummeted 31.5% from its $33.29 per unit closing price on July 1, 2013, down to $22.79 at the close of trading on July 3, 2013, following the announcement.

73.     The decrease in the price of the LINE units at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud being revealed to investors and to the market.  The timing and magnitude of LINE's unit price decrease on July 2 and 3, 2013 – as compared to the rest of the financial marketplace - negates any inference that the losses suffered by Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' fraudulent conduct.

74.     The economic loss, i.e. damages suffered by Plaintiff and other members of the Class, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of LINE's units.

75.     The Individual Defendants were uniquely motivated to artificially inflate the price of LINE units because they stood to gain the most from the upward manipulation of the market. By withholding material information from the market, the Defendants were able to present the appearance that the Company was financially healthy and that its high-yield distribution would continue and even increase upon consummation of the Berry acquisition.  As a result, the Individual Defendants, given their substantial holdings in the Company and lucrative employment agreements, experienced a large pecuniary benefit from the artificial inflation of the units' trading price.

76.     Specifically, Defendant Ellis currently holds approximately 656,762 units of LINE.  Ellis's substantial Company holdings motivated him to keep the value of LINE's units artificially inflated during and throughout the Class Period in order to maximize the value of those holdings.  On January 30, 2013, just two weeks before the first Barron's article began to uncover the truth concerning the Company's hedging strategies and distributable cash flow, Ellis

sold 58,042 LINE units through a non-open market disposition between the prices of $38.69-$38.76 per unit and received $2,248,000 from these transactions.  During the Class Period, Ellis sold Company units at artificially inflated levels, for a total of $4,024,583.

77.     Defendant Rockov currently holds approximately 359,880 LINE units. Rockov's substantial Company holdings motivated him to keep the value of LINE's units artificially inflated during and throughout the Class Period in order to maximize the value of those holdings.  On January 30, 2013, just two weeks before the first Barron's article began to uncover the truth concerning the Company's hedging strategies and distributable cash flow, Rockov sold 19,121 LINE units through a non-open market disposition between the prices of $38.69-$38.76 per unit and received $740,000.  During the Class Period, Rockov sold Company units at artificially inflated levels for a total of $1,457,959.

78.     Defendant Rottino currently holds approximately 125,250 LINE units.  Rottino's substantial Company holdings motivated him to keep the value of LINE's units artificially inflated during and throughout the Class Period in order to maximize the value of those holdings. On January 30, 2013, just two weeks before the first Barron's article began to uncover the truth concerning the Company's hedging strategies and distributable cash flow, Rockov sold 10,250 units through a non-open market disposition between the prices of $38.69-$38.76 per unit and received $397,000.  During the Class Period, Rottino sold Company units at artificially inflated levels for a total of $1,534,500.

79.     Thus, the Individual Defendants were motivated to keep the stock price artificially inflated and directly benefited from the artificial inflation in the stock caused by their and the Company's material misrepresentations and omissions.

**Additional Scienter Allegations**

80.     As alleged herein, Defendants acted with scienter in that each Defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding LINE, as well as their control over, and/or receipt and/or modification of LINE's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning LINE, participated in the fraudulent scheme alleged herein.

81.     Defendants were motivated to materially misrepresent to investors the true financial condition of the Company because it enabled the Company to project sustainability of its high yield distribution, which in turn, kept the Company's unit price artificially inflated despite lagging production and negative distributable cash flow.

**Applicability of Presumption of Reliance: Fraud-On-the-Market Doctrine**

82.     At all relevant times, the market for LINE's units was an efficient market for the following reasons, among others:

        (a)     The LINE units met the requirements for listing, and was listed and actively traded on the NASDAQ national market exchange, a highly efficient and automated market;

        (b)     As a regulated issuer, LINE filed periodic public reports with the SEC;

(c)      LINE regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)      LINE was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

83.     As a result of the foregoing, the market for the LINE units promptly digested current information regarding LINE from all publicly available sources and reflected such information in LINE's unit price.  Under these circumstances, all buyers of LINE units during the Class Period suffered similar injury through their purchase of those units at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

84.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of LINE who knew that those statements were false when made.

**Basis of Allegations**

85.     Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of SEC filings by LINE, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**FIRST CLAIM**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

86.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87.     During the Class Period, the Company and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding LINE's future prospects, cash flow and high yield distribution; (ii) deceive the investing public concerning the actual costs effecting the Company's distributable cash flow; (iii) enable Defendants to artificially inflate the price of LINE units; and (iv) cause Plaintiff and other members of the Class to purchase LINE units at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

88.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements

not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's units in an effort to maintain artificially inflated market prices for LINE units in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

89.     Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal negative material information about LINE's financial condition, cash flow, and future prospects as specified herein.

90.     Defendants employed devices, schemes and artifices to defraud, while in possession of material, positive non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to deceive investors about LINE's true value, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about LINE and its financial condition, cash flow and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of LINE units during the Class Period.

91.     Defendants' primary liability, and controlling person liability, arises from the following facts: (i) Ellis, Rockov and Rottino were high-level executives of the Company during the Class Period and members of the Company's management team; (ii) Ellis, Rockov and Rottino, by virtue of their responsibilities and activities as senior officers of the Company were

privy to and participated in the creation, development and reporting of the Company's plans, projections and/or reports; (iii) Ellis, Rockov and Rottino were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading; and (iv) as alleged above, directly made material misstatements.

92.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts.  These material misrepresentations and/or omissions were done knowingly or with reckless disregard for the purpose and effect of concealing LINE's financial condition, cash flow and future business prospects from the investing public and supporting the artificially inflated price of its units.  As demonstrated by Defendants' omissions and misstatements of the Company's business, cash flow, and future prospects of LINE throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

93.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of LINE units was artificially inflated during the Class Period.  In ignorance of the fact that market prices of LINE's publicly-traded units were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which LINE units traded, and/or on the absence of material negative information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants

during the Class Period, Plaintiff and the other members of the Class purchased LINE units during the Class Period at artificially inflated prices and were damaged thereby.  At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the Company's accounting practices, hedging strategy and its effect on distributable cash flow, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased LINE units at such artificially inflated levels.

94.     By virtue of the foregoing, Defendants LINE, Ellis, Rockov, and Rottino have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

95.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the LINE units during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against**
**Individual Defendants**

96.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

97.     The Individual Defendants acted as controlling persons of LINE within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making

of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

98.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

99.     By virtue of their positions as controlling persons of LINE, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of their wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the LINE units during the Class Period.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as lead plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as lead counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.    Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: July 15, 2013

THE BILEK LAW FIRM, L.L.P.

Thomas E. Bilek
700 Louisiana, Suite 3950
Houston, TX 77002
Tel: (713) 227-7720
Fax: (713) 227-9404
E-mail: tbilek@bileklaw.com

**OF COUNSEL:**

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax:  (212) 545-4653

/723234

35

# **EXHIBIT A**

# PLAINTIFF'S CERTIFICATION

Catherine A Fisher Trustee U/A DTD May 29, 1993 Catherine A Fisher Trust ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

      1.    Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

      2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

      3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

      4.    Plaintiff's transaction in Linn Energy LLC (ticker "LINE") securities during the Class Period specified in the Complaint are as follows:

| Date | # of Shares | Purchased/Sold | Price |
|---|---|---|---|
| 2/28/11 | 1,000 | Purchased | $38.80 |
| 1/12/12 | 1,000 | Purchased | $35.95 |

      5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

      6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _16_ day of July, 2013.

_Catherine A. Fisher_
Signature

_Catherine A. Fisher_
Print Name

723221